## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LORI MARINO                    :
  Plaintiff,                  :
                            :
       v.                     :   Civil No. 3:14CV705(AVC)
                            :
GUILFORD SPECIALTY GROUP, INC. :
  Defendant.                  :

### <u>RULING ON THE DEFENDANT'S MOTION TO DISMISS</u>

    This is an action for damages and declaratory relief.  It is brought by the plaintiff, Lori Marino, against her former employer, Guilford Specialty Group, Inc. ("Guilford Specialty").[1] It arises out of Guilford Specialty's use of a non-competition agreement following Marino's departure from the company.

    The complaint is brought pursuant to common law tenets concerning tortious interference with business expectancies, negligent misrepresentation, and promissory estoppel. Jurisdiction is authorized pursuant to 28 U.S.C. § 1332[2] on the basis of diversity of citizenship.

    Guilford Specialty has filed the within motion to dismiss pursuant to Rule 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure, asserting that counts one, two, and three fail

---

[1] The complaint originally named Guilford Specialty and International

[2] 28 U.S.C. § 1332 provides, in relevant part: "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states."

to state claims upon which relief may be granted and count four is not ripe.  The issues presented are: 1) whether Guilford Specialty used "improper means" to state a claim for tortious interference with business expectancies; 2) whether Guilford Specialty made a misrepresentation of fact that Marino reasonably relied upon to her detriment; 3) whether Guilford Specialty made a clear and definite promise to state a claim for promissory estoppel; and 4) whether a declaratory judgment as to the enforceability of the restrictive covenants agreement is ripe.

For the following reasons, the motion to dismiss (document no. 18) is DENIED.

## FACTS

The complaint alleges the following facts:[3]

The plaintiff, Lori Marino, has over nineteen years of experience working within the insurance and reinsurance industry.  In September 2013, a reinsurance broker recommended her for a potential job opportunity to Louis D. Levinson, the president of the wholesale insurance group at International

---

[3] According to the complaint, "Marino brings this action to recover monetary damages from Defendants Guilford [Specialty] and IFG . . . ."  The allegations throughout the complaint, however, refer to IFG, rather than Guilford Specialty.  As indicated in Marino's motion to dismiss IFG as a defendant (document no. 31), "Robert D. Linton, the chairman of IFG, was at all relevant times the Chairman and President of [Guilford Specialty]."  For purposes of clarity, the court will refer to IFG throughout the fact section of this opinion, as the complaint does.  The discussion section, however, will refer to only Guilford Specialty, as it is the one remaining defendant in this case.

Financial Group ("IFG").  Levinson called Marino, informed her of his goal to start a professional lines division, and asked her to contact Robert D. Linton, IFG's chairman, to arrange an interview.

On October 2, 2013, Marino met with Linton to discuss her proposed role, which involved membership on the executive leadership team, responsibility for establishing IFG's presence in the professional liability market, and working out of offices in New York City.  Linton asked Marino to prepare a business plan if she wanted to be offered the role.

On October 10, 2013, Marino met with Levinson to discuss her draft business plan, which provided an analysis of IFG's opportunity in the professional liability market and included information regarding IFG's resources and risk appetite.  After discussing it and refining it with Levinson, Marino submitted a final business plan to Linton.

In late October 2013, Marino traveled to Hartford, Connecticut, to interview with Betsy Monrad, IFG's chief operating officer and executive vice president.  Over the next few weeks, Marino, Linton, and Monrad negotiated Marino's compensation and title.  On November 23, 2013, Marino received an offer letter to serve as a senior vice president and director of professional lines.  This letter also included an agreement entitled "Confidentiality and Intellectual Property Agreement

with Certain Other Restrictive Covenants" (the "restrictive covenants agreement"), which contained a non-competition agreement.

After reviewing the documents, Marino expressed concern to Joel Burkowsky, the head of human resources, about the restrictive covenant agreement, especially with respect to the non-competition agreement.  Burkowsky advised Marino that every employee signed the agreement and that if she refused to sign it, the company would revoke her offer.  On November 26, 2013, Marino spoke with Linton by telephone and stated that "she felt pressured and rushed to sign the Restrictive Covenants Agreement because she was currently unemployed and had no leverage to refuse."  Linton responded that "he had never enforced a non-compete in 25 years and that if an employee wanted to leave and work elsewhere he has never stood in the way."  Linton further stated that the "only purpose in requiring execution of the Restrictive Covenants Agreement was to protect policies IFG had written and keep teams from being taken to competitors." Ultimately, this conversation convinced Marino to sign the agreements.  On December 3, 2013, Marino signed the offer letter and restrictive covenants agreement, and on January 6, 2014, she began work.

Sometime in November 2013, during the time in which these negotiations took place, Marino submitted an application to

Swiss Re for employment.  On January 14, 2014, a Swiss Re
recruiter contacted Marino to discuss her pending application.
Marino informed the recruiter that she recently joined IFG,
which was a client of Swiss Re's reinsurance division, and that
her employment agreement contained a non-competition agreement.
Despite learning this information, the recruiter continued to
contact Marino, but she never asked for an updated application
or a copy of the non-competition agreement.

    Throughout the first couple of weeks at IFG, Marino began
to doubt IFG's commitment to the professional lines division.
During her first week, Linton and Monrad "admonished" Marino for
sharing her business plan with IFG's senior vice president and
chief marketing officer and told her that it should not be
shared with anyone at the company.  Linton and Monrad also
decided not to pursue temporary office space in New York City.
On January 17, 2014, the Friday before Martin Luther King
weekend, IFG issued a press release announcing Marino's hire and
the company's plan to enter the professional lines market, which
disappointed and confused Marino, "as it is well known in the
industry that if you release something on the Friday afternoon
preceding a holiday weekend, the news reaches a far more limited
audience."

    On January 21, 2014, Marino sent an e-mail to Linton
notifying him that she received the first submission on

professional lines.  Linton responded "stating that she was not
to accept any submissions or write any business until: (a) a
reinsurance contract was in place and signed; and (b) a pricing
actuary dedicated to professional lines was hired and on board
at IFG."  Marino indicated to Linton that she was "simply
keeping [him] in the loop on the market reaction to IFG's
announcement."  She also "remind[ed] [him] that her business
plan called for use of an outside filing/actuarial consulting
firm to assist with development of forms and pricing of the
products," which Linton dismissed by stating that IFG's chief
actuary would hire a professional lines pricing actuary without
her input.

On January 31, 2014, Linton requested that Marino change
her business plan to limit the insurance capacity offered on her
products, to restrict the types of coverage offered, and to
increase her reinsurance limits to a level outside industry
norms.  Marino responded that increasing the reinsurance limits
would cause the professional lines to run unprofitably for years
and IFG would become uncompetitive in the professional lines
market.

In late January 2014, Marino met with Robert Petrilli, the
chief executive officer and managing director of corporate
solutions at Swiss Re.  Marino and Petrilli agreed that "there
was no active conflict or concern with moving forward because

6

IFG and Swiss Re did not compete at all in the Professional Lines space."  Throughout the next month, Marino interviewed with Swiss Re executives and board members.

On February 10, 2014, Marino learned from IFG's senior vice president and chief information officer, Raymond Karrenbauer, that the company's infrastructure could not process the type of business Marino intended to write.  Karrenbauer estimated that "it would take at least 18 months to complete the necessary build-out given the rigorous regulatory and financial reporting requirements needed for admitted versus non-admitted business." This eighteen month delay had never been disclosed previously to Marino.

On February 18, 2014, IFG hired Christopher M. Lewis as senior vice president and chief risk officer.  Thereafter, Linton and Lewis met with several professional lines reinsurance companies and brokers without Marino.

On February 21, 2014, Marino expressed concerns to Levinson about the changes in her business plan, her exclusion from business meetings, and the multiple impediments she continually faced.  On February 22, 2014, Linton asked for Marino's opinion about IFG possibly hiring an executive vice president from another firm.  Marino told Linton that "it would significantly dilute her role."  On February 28, 2014, Marino provided Linton

with a revised business plan.  Linton responded with more
questions and hurdles not previously discussed.

On March 3, 2014, "Petrilli conveyed to Marino an oral
offer of employment" on behalf of Swiss Re.  During that
conversation, Petrilli informed Marino that the non-competition
agreement would not be an issue.  On March 4, 2014, Marino
orally accepted a slightly amended offer and that afternoon, she
signed a formal offer letter.

Later that same day, Marino met with Levinson, who informed
her that Eric Smith, the president and chief executive officer
of Swiss Re Americas, called Linton and told him that Marino
accepted the company's offer.  Levinson noted that Linton was
"ballistic" about the news of her departure.  To inform IFG of
her resignation, Marino e-mailed a formal resignation letter to
Linton and Monrad.

Following her resignation, "Linton made multiple calls to
senior executives at various entities within Swiss Re Group
Holdings for the purpose of intimidating Swiss Re into revoking
Marino's offer of employment."  He informed these individuals of
the non-competition agreement and his intention to enforce it.
Moreover, Linton misrepresented to Swiss Re that IFG paid
significant fees to recruiters in hiring Marino and leased
office space in New York City for Marino and her team.  Linton
also threatened to wage a public relations campaign against

Swiss Re for hiring a client's employee.  On March 5, 2014,
"Petrilli advised Marino that Linton 'has reached the General
Counsel of Swiss Re Group in Zurich' and that the 'beehive has
been kicked.'"

On March 6, 2014, Marino spoke with representatives from
Swiss Re's human resources and legal departments.  The next day,
Swiss Re revoked Marino's offer.  On March 11, 2014, Marino
spoke with Monrad and requested that Linton retract his
"misrepresentations and threats."  Monrad noted that Marino "had
just picked the wrong company (Swiss Re) to go to."

## DISCUSSION

### I.   Rule 12(b)(6) – Failure to State a Claim

#### a. Standard

The court must grant a motion to dismiss pursuant to rule
12(b)(6) of the Federal Rules of Civil Procedure if a plaintiff
fails to establish a claim upon which relief may be granted.  A
motion to dismiss "assess[es] the legal feasibility of the
complaint, [but it does] not . . . assay the weight of the
evidence which might be offered in support thereof."  Ryder
Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc., 748
F.2d 774, 779 (2d Cir. 1984).  When ruling on a motion to
dismiss, the court must presume that the well-pleaded facts
alleged in the complaint are true and draw all reasonable

inferences from those facts in favor of the plaintiff.  See Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993).

The issue at this juncture is not whether the plaintiff will prevail but whether he should have the opportunity to prove his claim.  See Conley v. Gibson, 355 U.S. 41, 45 (1957).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Gibbons v. Malone, 703 F.3d 595, 599 (2d Cir. 2013).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678; see also Twombly, 550 U.S. at 555 (stating that a complaint must provide more than "a formulaic recitation of the elements of a cause of action").  In its review of a 12(b)(6) motion to dismiss, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken."  Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993).

### b. Counts One, Two, and Three

#### i. Tortious Interference with Business Expectancies

Count one of the complaint alleges that the defendant "intentionally interfered with Marino's business expectancy with Swiss Re by, among other things, misrepresenting the financial investment IFG made in Marino's hire, threatening to sue to enforce Marino's non-compete and threating to wage a public relations campaign against Swiss Re for hiring an employee away from one of its clients."

Guilford Specialty argues that the complaint fails to establish that the company acted with an "improper motive" or used "improper means."  Marino responds that Guilford Specialty used "improper means" by lying to Swiss Re about the significant investment it made in Marino and about a supposed lease it signed in New York City for Marino and her team.  Marino also contends that Guilford Specialty threatened to enforce the non-competition agreement and to wage a public relations campaign against Swiss Re for hiring an employee away from one of its clients.

To state a claim for tortious interference with business expectancies, a complaint must allege: "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a

result of the interference, the plaintiff suffers actual loss."
Am. Diamond Exch., Inc. v. Alpert, 302 Conn. 494, 510 (2011)
(quoting Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20,
27 (2000)).  It is axiomatic that this tort requires tortious
conduct,[4] which a complaint may demonstrate by proof of fraud,
misrepresentations, intimidations, molestations, or malicious
conduct.  Daley v. Aetna Life & Cas. Co., 249 Conn. 766, 806
(1999).  Accordingly, the complaint must "plead and prove at
least some improper motive or improper means."  Id.  The issue
here is whether the complaint sufficiently pleads that the
defendant's conduct "was in fact tortious."  Id.

Here, the complaint alleges that Linton misrepresented to
Swiss Re the fees IFG paid to hire Marino and the long-term
lease it signed for office space in New York City for Marino and
her team.  Although the court recognizes that "the mere uttering
of untrue and inflammatory comments does not constitute
molestation or intimidation," Toro v. Arnold Foods Co., Inc.,
No. 3:07-CV-1356 (JCH), 2008 WL 4000632, at *3 (D. Conn. Aug.
28, 2008), the allegations sufficiently demonstrate improper
means based upon fraud or misrepresentations.  The complaint

---

[4] The Connecticut supreme court has acknowledged that "[e]very act of
interference is not . . . made tortious." Blake v. Levy, 191 Conn. 257, 261
(1983).  As one district court has acknowledged: "[T]he *interference*
complained of must be *tortious*.  In an ostensibly practical and sensible
world, it could not be otherwise. . . . If we could file a civil action
against anyone who interfered with our . . . business expectancies, the
courts would have no time to do anything else." Kopperl v. Bain, 23 F. Supp.
3d 97, 110 (D. Conn. 2014).

also pleads improper means based upon intimidation by alleging that Linton threatened to wage a public relations war against Swiss Re.  This alleged threat did not relate to the non-competition agreement, but instead rests solely upon Swiss Re's decision to hire Marino.  These allegations are sufficient to state a claim for tortious interference with business expectancies at the motion to dismiss phase of litigation. Accordingly, the motion to dismiss count one is denied.

### ii. Negligent Misrepresentation

Count two alleges negligent misrepresentation by Guilford Specialty in supplying Marino with false information during her recruitment concerning the scope of the business she would lead and the firm resources available to her.

To state a claim for negligent misrepresentation, a complaint must allege "(1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." Coppola Const. Co., Inc. v. Hoffman Enters. Ltd. P'ship, 309 Conn. 342, 351-52 (2013) (quoting Nazami v. Patrons Mut. Ins. Co., 280 Conn. 619, 626 (2006)).

Guilford Specialty argues that Marino has failed to identify a false statement by IFG.  Specifically, Guilford Specialty contends that the statements relate to predictions or

13

opinions, rather than a statement of "then-existing fact."
Marino responds that "IFG had no intention of permitting Marino
to implement her business plan despite approving it prior to the
start of her employment."  She further argues that "IFG failed
to exercise reasonable care in describing its resources and risk
appetite, as well as the scope of Marino's role and
responsibilities, and in accepting her business plan, which it
did not intend to——nor could it——implement."

The Connecticut supreme court has acknowledged that "a
misrepresentation must relate to an existing or past fact, . . .
[but] that a promise to do an act in the future when coupled
with a present intent not to fulfill the promise, is a false
representation."  Paiva v. Vanech Heights Constr. Co., 159 Conn.
512, 515 (1970).  "The requirement that a representation be made
as a statement of fact 'focuses on whether, under the
circumstances surrounding the statement, the representation was
intended as one of fact as distinguished from one of opinion.'"
Meyers v. Cornwell Quality Tools, Inc., 41 Conn. App. 19, 29
(1996) (quoting Crowther v. Guidone, 183 Conn. 464, 468 (1981)).

In this case, the timeline following Marino's hire
indicates that IFG may not have intended to implement Marino's
business plan or provide her with the resources necessary to
build a professional lines division, despite the company's
promises to do so.  Therefore, the complaint adequately alleges

14

"false representations" for purposes of this negligent misrepresentation cause of action.

Guilford Specialty next argues that Marino "could not have reasonably relied on IFG's representations about her job because she was employed at-will, her Offer Letter established that her duties were subject to the control of her superiors, and the representations involved uncertain, forward-looking strategic business decisions."  Marino responds that reasonableness is a question of fact reserved for the trier of fact, and that Marino's reliance on IFG's representations were reasonable under the circumstances.

"[T]he issue of whether Plaintiff's reliance on the representations were reasonable is a question of fact not properly decided on a motion to dismiss." Vertrue Inc. v. Meshkin, 429 F. Supp. 2d 479, 499 (D. Conn. 2006); see also Petrucelli v. Palmer, 596 F. Supp. 2d 347, 366 (D. Conn. 2009) (recognizing that "the reasonableness of a plaintiff's reliance is a question for the trier of fact"); Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 580 (1995) (noting that the Connecticut supreme court "ha[s] consistently held that reasonableness is a question of fact for the trier to determine based on all of the circumstances").  At this stage of the proceedings, it is too early to determine whether Marino reasonably relied on the representations, and accordingly, the

15

court concludes that the allegations contained in the complaint sufficiently plead the third element of a negligent misrepresentation cause of action.

Finally, Guilford Specialty argues that the complaint fails to allege that the plaintiff suffered any pecuniary harm as a result of the alleged misrepresentations, as she was unemployed prior to accepting the position at IFG.  Guilford Specialty also contends that there is no link between the alleged misrepresentations and Swiss Re revoking her offer of employment.  Marino responds that she "lost the opportunity to accept another job, which although not pending at the time she joined IFG, became available days thereafter."

Causes of actions alleging negligent misrepresentation must allege facts demonstrating a causal connection between the misrepresentations and the pecuniary harm resulting therefrom. See Glazer v. Dress Barn, Inc., 274 Conn. 33, 78-79 (2005) (noting that causation is an essential element of a negligent misrepresentation claim); see also Revak v. SEC Realty Corp., 18 F.3d 81, 90 (2d Cir. 1994) ("Like any cause of action sounding in negligence, negligent misrepresentation requires a showing of proximate cause.").  The pecuniary harm suffered must be a "natural and proximate consequence" of the alleged misrepresentations.  Johnson v. Chesebrough-Pond's USA Co., 918 F. Supp. 543, 549 (D. Conn. 1996) (quoting Kilduff v. Adams,

16

Inc., 219, Conn. 314, 323-24 (1991)); see Omega Eng'g, Inc. v. Eastman Kodak Co., 30 F. Supp. 2d 226, 254 (D. Conn. 1998) ("To prove a claim for negligent misrepresentation, a plaintiff must . . . allege an injury that is the direct and proximate result of the alleged misconduct."); Capital Mortg. Assocs., LLC v. Hulton, No. NNICV065000431S, 2009 WL 567057, at *24 (Conn. Super. Ct. Feb. 13, 2009) (noting that the damages to be recovered in action for negligent misrepresentation must be a natural and proximate consequence of the misrepresentation). "[I]n addition to showing that but for defendant's alleged misrepresentations plaintiff would not have suffered his asserted damages, plaintiffs must also show that the misstatements were the reason plaintiffs suffered those damages." Johnson v. Chesebrough-Pond's USA Co., 918 F. Supp. 543, 549 (D. Conn. 1996) (citing First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994)).

The issue of whether a defendant's misrepresentations proximately caused the plaintiff's injuries is not normally resolved on a motion to dismiss. See Coburn v. Lenox Homes, Inc., 186 Conn. 370, 384 (1982) (noting that "[p]roximate cause is ordinarily a question of fact"). Although Marino's articulation of the sequence of events[5] demonstrates a rather

---

[5] Specifically, Marino argues: "If Marino had not accepted IFG's offer, she would still have been contacted by, and received an offer of employment from,

attenuated causal connection between the misrepresentations and the pecuniary harm suffered, proximate cause becomes a question of law only when "a fair and reasonable person could only reach one conclusion." Aviamax Aviation Ltd. V. Bombardier Aerospace Corp., No. 3:08-cv-1958(CFD), 2010 WL 1882316, at *8 (D. Conn. May 10, 2010); see also Shetucket Plumbing Supply Inc. v. S.C.S. Agency, Inc., 570 F. Supp. 2d 282, 286 (D. Conn. 2008).  At this stage of the proceedings, the court cannot hold, as a matter of law, that Linton's alleged negligent misrepresentations did not proximately cause the loss of the opportunity to pursue alternative employment.  Viewing the facts in favor of Marino, the complaint sufficiently pleads pecuniary harm resulting from the alleged negligent misrepresentations.  Accordingly, the motion to dismiss count two is denied.

### iii. Promissory Estoppel

Count three alleges that Linton made "clear and definite promises to Marino" relating to the non-competition agreement. Specifically, the complaint alleges that Linton represented that 1) "he had never enforced a non-compete in 25 years and that if an employee wanted to leave and work elsewhere he has never stood in the way," and 2) "his only purpose in requiring non-competes was to keep teams from being taken to competitors."  It

---

Swiss Re, which offer would not have been revoked in the absence of the Non-Compete or interference by Linton."

further alleges that Marino reasonably relied on these representations by signing the offer letter and restrictive covenants agreement.

Guilford Specialty argues that the plaintiff fails to identify a clear and definite promise, as the statements relate to past conduct, rather than future intent, or express an opinion.  Marino responds that Linton's statements to her regarding the non-competition agreement "can only be interpreted as a promise to act in a consistent manner with regard to Marino."

"A fundamental element of promissory estoppel . . . is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance." Stewart v. Cendant Mobility Servs. Corp., 267 Conn. 96, 104 (2003) (quoting D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch., 202 Conn. 206, 213 (1987)).  The Connecticut supreme court has reasoned that "[a]lthough the promise must be clear and definite, it need not be the equivalent of an offer to enter into a contract because '[t]he prerequisite for . . . application [of the doctrine of promissory estoppel] is a promise and not a bargain and not an offer.'" Id. at 105 (alterations in original) (emphasis omitted) (quoting 3 A. Corbin, Contracts § 8.9 (rev. ed. 1996)).  Clarity and definiteness, as opposed to expressions of intention, hope, desire, or opinion, are the determinative

19

factors in deciding whether a statement is a promise.  Id. at
105-06.

 "Whether a representation rises to the level of a promise
is generally a question of fact, to be determined in light of
the circumstances under which the representation was made."
Stewart v. Cendant Mobility Servs. Corp., 267 Conn. 96, 104
(2003).  Dismissal of the cause of action for failure to state a
claim is improper "unless it appears beyond doubt that the
plaintiff can prove no set of facts in support of [her] claim
which would entitle [her] to relief."  Conley v. Gibson, 355
U.S. 41, 45-46 (1957).  Here, the complaint sufficiently alleges
that under the circumstances, Linton made a clear and definite
promise to not enforce the non-competition agreement unless an
entire team moved to a competitor.  The complaint alleges that
Marino raised specific concerns with respect to the agreement,
and Linton stated that he had never enforced the non-competition
agreement in the past and he had never prohibited an employee
from leaving the company.  Taken together, the allegations
sufficiently state that under the circumstances, Linton made a
clear and definite promise.

 Guilford Specialty next argues that the complaint cannot
allege a promissory estoppel claim that contradicts the terms of
a written contract.  Specifically, it contends that the non-
competition agreement "did not contain a clause saying it would

never be enforced, nor that it would be enforced only in limited circumstances that are narrower than its express terms."  Marino responds that Linton's promises did not contradict the non-competition agreement, but rather set forth limited circumstances under which the provision would be enforced.

The Connecticut supreme court has held that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch., 202 Conn. 206, 213 (1987) (alteration in original).  When an enforceable contract exists, however, "parties cannot assert a claim for promissory estoppel based on alleged promises that contradict the written contract."  Lark v. Post Newsweek Stations Conn., Inc., No. CV940705326, 1995 WL 491290, at *3 (Conn. Super. Ct. Aug. 9, 1995).  Put differently, a plaintiff "cannot use the theor[y] of promissory estoppel . . . to add terms to [a] contract that are entirely inconsistent with those expressly stated in it."  Wood v. Sempra Energy Trading Corp., No. 03-CV-986(JCH), 2005 WL 465423, at *11 (D. Conn. Feb. 22, 2005).

Here, the promissory estoppel claim is based on a conversation between Marino and Linton prior to Marino signing the restrictive covenants agreement.  Although it appears that

Marino is attempting to add terms to the restrictive covenants agreement, Marino also alleges that the agreement is not enforceable.  Because the court has not concluded yet that the agreement is a valid, enforceable contract, Marino can maintain a cause of action for promissory estoppel at this stage of the litigation.  See Datto Inc. v. Braband, 856 F. Supp. 2d 354, 374 (D. Conn. 2012) (holding that an express contract existed as a matter of law, and, therefore, the plaintiff could not "overlook the existence of an express contract to assert a theory of promissory estoppel").  Accordingly, the motion to dismiss count three is denied.

## II.   Rule 12(b)(1) – Lack of Subject Matter Jurisdiction

### a. Standard

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Markarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In analyzing such a motion to dismiss, the court must "accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor."  Merritt v. Shuttle, Inc., 245 F.3d 182, 186 (2d Cir. 2001).  The party asserting jurisdiction, however, "bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638

(2d Cir. 2005).  Therefore, "jurisdiction must be shown
affirmatively and that showing is not made by drawing from the
pleadings inferences favorable to the party asserting it."
Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir.
1998). "In resolving a motion to dismiss for lack of subject
matter jurisdiction under Rule 12(b)(1) a district court may
consider evidence outside the pleadings."  Morrison v. Nat'l
Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008).

### b. Declaratory Judgment

Count four "seeks a declaratory judgment by this Court as
to the enforceability of the Restrictive Covenants Agreement, in
whole or in part."  Specifically, it alleges that the agreement
is not enforceable, as it is unreasonable and against public
policy.

Guilford Specialty argues that the claim is not ripe, as
Marino does not currently have a job offer from a competitor.
It contends that Marino is "seeking a determination of her
rights based on a series of contingencies that may never come to
fruition," such as receiving a job offer from a competitor,
accepting the job offer, and Guilford Specialty attempting to
enforce the non-competition agreement.  It further states that a
ruling from this court on the enforceability of the provision
"would have to be based on hypothetical scenarios in which IFG
might attempt to enforce it," which would "run afoul of the

prohibition against advisory opinions."  Marino responds that "the events involving Swiss Re evidence the likelihood Marino will be offered employment by a competitor and that IFG will seek to enforce the Non-Compete."

At the outset, the court finds that the non-competition agreement has now expired.  On March 4, 2014, as alleged in the complaint, "Marino e-mailed her formal resignation letter to Linton and Monrad."  Count four states that the restrictive covenants agreement at issue "contains a one-year non-competition provision."  A review of the non-competition agreement confirms that "[d]uring the period beginning on the last day of the Employment Period . . . and concluding twelve (12) months thereafter . . . the Employee shall not, directly or indirectly, anywhere participate in the ownership, management, operation or control of a Competitive Business."  Therefore, this non-competition agreement expired on March 5, 2015, and a declaration concerning its prospective non-enforceability is moot.

This determination does not foreclose a declaratory judgment as to the restrictive covenants agreement as a whole, however.  The within motion to dismiss contests the ripeness of the declaratory judgment with respect to only the enforceability of the non-competition agreement, but it does not raise issue with a declaratory judgment concerning the restrictive covenants

24

agreement as a whole.  The court concludes that there is a substantial controversy between Guilford Specialty and Marino concerning the restrictive covenants agreement, which may have an impact on the ability for Marino to bring the promissory estoppel claim.  Accordingly, the motion to dismiss count four is denied.

**CONCLUSION**

Based upon the foregoing, the motion to dismiss counts one, two, three, and four of the complaint (document no. 18) is DENIED.

It is so ordered, this 21st day of March 2015, at Hartford, Connecticut.

/s/

Alfred V. Covello,
United States District Judge