## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

**LORI MARINO,**                                       :
                                                       :
                   *Plaintiff*,                        :
                                                       :
          v.                                           :          Civil Action No.: 3:14-cv-00705 (AVC)
                                                       :
**GUILFORD SPECIALTY GROUP, INC.**                     :
                                                       :          Electronically Filed
                   *Defendant*.                        :
                                                       :
                                                       :

### ANSWER AND COUNTERCLAIM

Defendant Guilford Specialty Group, Inc. ("GSG") hereby responds as follows to the

allegations in the Complaint filed in this action by Lori H. Marino ("Marino"):

### THE PARTIES

1.      On information and belief, GSG denies the allegation that Marino resides at 505

East 79th Street, New York, NY 10075.

2.      Admitted.

3.      International Financial Group, Inc. has been dismissed from this lawsuit, therefore

no response to Paragraph 3 is required.

### JURISDICTION AND VENUE

4.      Paragraph 4 states a legal conclusion to which no response is required.

5.      Paragraph 5 states a legal conclusion to which no response is required.

### NATURE OF THE CASE

6.      Paragraph 6 contains Plaintiff's characterization of her claims, to which no

response is required.  To the extent a response is required, GSG denies all allegations stated therein.

## FACTUAL ALLEGATIONS

7.      GSG lacks information sufficient to form a belief as to the truth of the allegations in Paragraph 7 and those allegations are therefore denied.

8.      GSG admits that in a press release dated August 26, 2013, IFG announced that Louis D. Levinson had been named President of IFG's Wholesale Insurance Group.  GSG also admits that Levinson and Marino knew each other previously.  GSG lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 8 and those allegations are therefore denied.

9.      GSG admits that Mr. Levinson called Marino.  GSG denies the remaining allegations in Paragraph 9.

10.     GSG admits the allegations in the first sentence of Paragraph 10.  GSG denies the remaining allegations in Paragraph 10.

11.     GSG admits that Plaintiff prepared a draft business proposal.  GSG denies the remaining allegations in Paragraph 11.

12.     Denied.

13.     GSG admits only that Marino sent her draft business proposal to Mr. Linton. GSG denies the remaining allegations in Paragraph 13, including any allegation that Mr. Linton approved the proposal.

14.     GSG admits the allegations in the first sentence of Paragraph 14.  GSG denies the

remaining allegations in Paragraph 14.

15.     Admitted.

16.     Admitted.

17.     GSG admits that Plaintiff and Mr. Burkowsky communicated about the
Restrictive Covenants Agreement.  GSG denies the remaining allegations in Paragraph 17.

18.     GSG admits that only one change was made to the Restrictive Covenants
Agreement deleting, at Marino's insistence, a provision that would have required Marino to pay
GSG and its affiliates' attorneys' fees in the event GSG or any GSG affiliate takes legal action to
enforce the Restrictive Covenants Agreement.  GSG denies the remaining allegations in
Paragraph 18.

19.     Denied.

20.     GSG admits the allegations in the first sentence of Paragraph 20 and that Marino
reported on a day-to-day basis to Ms. Monrad.  The remaining allegations in Paragraph 20 are
denied.

21.     Admitted.

22.     Denied.

23.     GSG admits that IFG issued a press release on January 17, 2014 announcing
Marino's hiring.  GSG denies the remaining allegations in Paragraph 23.

24.     GSG admits that Mr. Linton organized a meeting with a reinsurance broker then
employed at Guy Carpenter.  GSG further admits that Mr. Linton cancelled the initial meeting
and then rescheduled.  GSG lacks information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 24 and those allegations are therefore denied.

25.     GSG admits that on or about January 21, 2014, Marino sent an email to Mr. Linton stating that the first submission on Professional Lines had been received.  GSG further admits that Mr. Linton responded by email to Marino informing her that submissions could not be accepted until a reinsurance contract was in place and a pricing actuary had been hired. GSG denies the remaining allegations in Paragraph 25.

26.     Denied.

27.     GSG admits that in January 2014, Marino visited potential temporary office space sites in New York City.  GSG denies the remaining allegations in Paragraph 27.

28.     Denied.

29.     GSG admits the allegations stated in the first two sentences of Paragraph 29. GSG denies the remaining allegations in Paragraph 29.

30.     GSG admits that Marino had lunch with Levinson at some point prior to her resignation from GSG.  GSG denies the remaining allegations in Paragraph 30.

31.     GSG admits that Mr. Levinson asked Marino for her thoughts on an Executive Vice President.  GSG denies the remaining allegations in Paragraph 31.

32.     GSG admits that Mr. Linton and Marino spoke on or about February 22, 2014, about the possibility that GSG might hire another senior executive for the professional lines division.  While GSG admits that Marino asked whether the hiring of another executive could dilute her role, GSG further answers that Mr. Linton assured Marino it would not and that GSG would not hire another executive if Marino had opposed doing so.  GSG denies the remaining allegations in Paragraph 32.

33. GSG admits that on or about February 28, 2014, Marino provided another draft of her business proposal and that Mr. Linton responded by emails asking Marino for further clarification and detail on her proposal. GSG further answers that Mr. Linton copied other employees on his email to Ms. Marino, all of whom were senior level managers who would be involved in executing the proposal. GSG denies the remaining allegations in Paragraph 33.

34. GSG admits that Marino told Levinson about her impending departure from GSG to join Swiss Re. GSG denies the remaining allegations in Paragraph 34.

35. GSG admits that Marino accepted a position at GSG on or about December 3, 2013. GSG has no knowledge of the truth or falsity of the remaining allegations contained in Paragraph 35 and those allegations are therefore denied.

36. GSG has no knowledge of the truth or falsity of the allegations contained in Paragraph 36 and those allegations are therefore denied.

37. GSG has no knowledge of the truth or falsity of the allegations contained in Paragraph 37 and those allegations are therefore denied.

38. GSG has no knowledge of the truth or falsity of the allegations contained in Paragraph 38 and those allegations are therefore denied.

39. GSG has no knowledge of the truth or falsity of the allegations contained in Paragraph 39 and those allegations are therefore denied.

40. GSG has no knowledge of the truth or falsity of the allegations contained in Paragraph 40 and those allegations are therefore denied.

41. GSG admits that Marino met with Mr. Levinson. GSG has no knowledge of the truth or falsity of the remaining allegations contained in Paragraph 41 and those allegations are

therefore denied.

42.     GSG admits that Mr. Levinson informed Marino that someone from Swiss Re had called Mr. Linton to inform Mr. Linton of Swiss Re's offer and Marino's verbal acceptance. GSG has no knowledge of the truth or falsity of the remaining allegations contained in Paragraph 42 and those allegations are therefore denied.

43.     Denied.

44.     GSG admits that Marino emailed her resignation letter to Mr. Linton on March 4, 2014.  The remaining allegations in Paragraph 44 are denied.

45.     GSG admits that Plaintiff called Mr. Linton to inform him that she was resigning from GSG and joining Swiss Re.  The remaining allegations in Paragraph 45 are denied.

46.     Denied.

47.     GSG admits that Mr. Linton communicated with certain senior executives at Swiss Re regarding Marino's non-compete agreement.  GSG denies the remaining allegations in Paragraph 47.

48.     GSG has no knowledge of the truth or falsity of the allegations contained in Paragraph 48 and those allegations are therefore denied.

49.     GSG has no knowledge of the truth or falsity of the allegations contained in Paragraph 49 and those allegations are therefore denied.

50.     Denied.

51.     GSG has no knowledge of the truth or falsity of the allegations contained in Paragraph 51 and those allegations are therefore denied.

52.     GSG admits that Swiss Re revoked its offer of employment to Marino.  GSG has

no knowledge of the truth or falsity of the remaining allegations contained in Paragraph 52 and

those allegations are therefore denied.

53.     Denied.

## FIRST CLAIM
(Tortious Interference with Business Expectancy)

54.     GSG responds to the allegations contained in Paragraphs 1 through 53 of the

Complaint as set forth in Paragraphs 1 through 53 of this Answer, which are incorporated by

reference herein.

55.     Admitted.

56.     Denied.

57.     Denied.

## SECOND CLAIM
(Negligent Misrepresentation)

58.     GSG responds to the allegations contained in Paragraphs 1 through 57 of the

Complaint as set forth in Paragraphs 1 through 57 of this Answer, which are incorporated by

reference herein.

59.     Denied.

60.     Denied.

61.     Denied.

62.     Denied.

## THIRD CLAIM
(Promissory Estoppel)

63.     GSG responds to the allegations contained in Paragraphs 1 through 62 of the Complaint as set forth in Paragraphs 1 through 62 of this Answer, which are incorporated by reference herein.

64.     GSG has no knowledge of the truth or falsity of the allegations contained in Paragraph 64 and those allegations are therefore denied.

65.     Denied.

66.     Denied.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Denied.

## FOURTH CLAIM
(Declaratory Judgment)

71.     GSG responds to the allegations contained in Paragraphs 1 through 70 of the Complaint as set forth in Paragraphs 1 through 70 of this Answer, which are incorporated by reference herein.

72.     The first sentence of Paragraph 72 contains a description of the Action to which no response is required.  GSG denies the second sentence of Paragraph 72.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Admitted.

WHEREFORE, GSG denies that Plaintiff is entitled to any of the relief requested from the Court, including declaratory relief, damages, or any other or further relief.

### GSG's AFFIRMATIVE DEFENSES

### First Affirmative Defense

77.     The Complaint fails to state a claim against GSG upon which relief may be granted.

### Second Affirmative Defense

78.     Some or all of the Claims in the Complaint are moot and/or not ripe.

### Third Affirmative Defense

79.     Some or all of the Claims in the Complaint are barred on account of Plaintiff's improper conduct or "unclean hands," including conduct that caused or contributed to the damages Plaintiff alleges.

### Fourth Affirmative Defense

80.     Some or all of the Claims in the Complaint are barred by the doctrine of estoppel.

### Fifth Affirmative Defense

81.     Some or all of the Claims in the Complaint are barred by Plaintiff's status as an at-will employee of Defendant.

### Sixth Affirmative Defense

82.     Some or all of the Claims in the Complaint are barred because Plaintiff

fraudulently induced GSG to hire her.

## Seventh Affirmative Defense

83.     Some or all of the Claims in the Complaint are barred insofar as they rely on parol evidence inconsistent with and not incorporated into the Restrictive Covenants Agreement.

## Eighth Affirmative Defense

77.     Some or all of the Claims in the Complaint are barred by the terms of the Restrictive Covenants Agreement Plaintiff signed as a condition of her employment.

## Ninth Affirmative Defense

78.     Some or all of the Claims in the Complaint are barred on account of Plaintiff's failure to abide by the terms of the Restrictive Covenants Agreement, which caused Swiss Re to revoke its offer of employment.

## Tenth Affirmative Defense

77.     Plaintiff's right to recovery, if any, must be offset by her failure to reasonably mitigate her alleged losses.

WHEREFORE, GSG respectfully requests that the Court enter Judgment:

a.  Dismissing Plaintiff's Complaint with prejudice;

b.  Declaring that Plaintiff is not entitled to any of the relief claimed against GSG in the Complaint;

c.  Awarding GSG its attorneys' fees and costs in defending this action; and

d.  Granting such other and further relief as the Court may deem just and proper.

**COUNTERCLAIMS OF GUILFORD SPECIALTY GROUP, INC.**

Guilford Specialty Group, Inc. ("GSG") hereby alleges the following for its counterclaims against the plaintiff Lori H. Marino:

**PARTIES**

1.      Counterclaim-Plaintiff GSG is a corporation organized under the laws of the State of Delaware with offices at 100 Pearl Street, Hartford, Connecticut 06103 that provides services to a group of affiliated insurance companies.

2.       On information and belief, Counterclaim-Defendant Lori H. Marino ("Marino") is an individual residing in New York State.

**NATURE OF THESE COUNTERCLAIMS**

3.      GSG's counterclaims stem from Marino's pattern of deceptive, wrongful and malicious misconduct before, during and after her brief period of employment by GSG.  Marino deceived GSG into hiring her by falsely representing that she was committed to a multiyear effort to build a professional lines business when, in reality, Marino used GSG as a means to extract substantial compensation and bide her time while she focused her energy on pursuing employment with a large competing insurer, Swiss Re Corporate Solutions ("Swiss Re").  In order to court Swiss Re, Marino intentionally concealed the terms of her non-compete agreement with GSG in violation of the express terms of that agreement.  Despite substantial investment and efforts by GSG and its affiliates to support Marino's development of the professional lines business, after less than two months on the job, Marino abruptly resigned from GSG on three days' notice to accept employment with Swiss Re.  GSG first learned of Marino's deception when a Swiss Re executive contacted GSG's President, who, assuming that Swiss Re was aware

that Marino had entered into the Confidentiality and Intellectual Property Agreement with Certain Other Restrictive Covenants (the "Restrictive Covenants Agreement") with GSG, inquired of the Swiss Re executive about such agreement. The Swiss Re executive expressed surprise and was not aware that Marino was subject to a Restrictive Covenants Agreement. Swiss Re, having previously raised questions about Marino's integrity, then decided to withdraw Marino's employment offer due to her deceptive failure to disclose the Restrictive Covenants Agreement with GSG. Instead of accepting that her own misconduct and deception caused her unemployment, Marino not only initiated this baseless lawsuit, but also maliciously facilitated another lawsuit brought against GSG and its affiliates by another competing insurance group from whom Marino sought employment — Argo Group U.S. ("Argo") — in order to interfere with GSG and its affiliates' business relationship with the incoming president of IFG's insurance business, Louis D. Levinson.

4.     These counterclaims therefore seek monetary damages arising from Marino's:

- breach of contract and her obligation to indemnify GSG and its affiliates for any and all claims arising out of, in connection with, or in any way related to GSG's informing Swiss Re of the Restrictive Covenants Agreement Marino signed as a condition of her employment;

- supplying false information to GSG during her recruitment (on which GSG relied in hiring her) and during her employment with GSG;

- violating her duty of loyalty and her contractual obligation to devote her full business time and best efforts exclusively to the advancement of GSG's business, by continuing to pursue employment with another

insurance company throughout the period during which she was employed by GSG; and

- violating her Restrictive Covenants Agreement by providing services to facilitate the Argo lawsuit, and unlawfully and tortiously interfering with the business activities of GSG.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over GSG's counterclaims pursuant to 28 U.S.C. §§ 1332 and 1367 because the parties are of diverse citizenship, the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and all claims are so integrally related to claims alleged by Marino that they form part of the same case or controversy.

6.      Venue is proper in the District of Connecticut under 28 U.S.C. § 1391 because a substantial part of Marino's acts, omissions and events giving rise to GSG's claims occurred in Connecticut.

## FACTUAL ALLEGATIONS

### Marino Joins GSG Under False Pretenses

7.      In late September 2013, Marino contacted Robert D. Linton, Chairman and President of GSG, to inquire about a position to start and lead a new professional lines insurance division.

8.      Mr. Linton had planned for some time to start a professional lines division.  He interviewed Marino on or about October 2, 2013, and they discussed Marino's proposed long-term role in developing and leading this new division.  During their conversation, Mr. Linton advised Marino that if she was only interested in a short-term employment opportunity, she

should not join GSG because GSG was interested in hiring someone who was committed to building a professional lines business over the long-term.

9.　　Marino represented that she had substantial start-up experience in the insurance industry and had achieved long-term success in the professional lines marketplace.  At the conclusion of the meeting, Marino unilaterally offered to deliver to Mr. Linton her thoughts for developing the professional lines division in a draft business proposal.

10.　　Marino submitted her unsolicited business proposal to Mr. Linton on October 18, 2013.  The proposal suggested a multiyear effort on Marino's part, including financial projections for the proposed professional lines division extending through 2018.  Over the next several weeks, Marino interviewed with other members of GSG's and its affiliates' senior management team to discuss her thoughts for starting and building a professional lines division. Throughout this recruitment process, Marino expressed enthusiasm about the opportunity to help GSG and its affiliates start and grow a professional lines business.

11.　　On November 20, 2013, while under consideration for the role with GSG and without GSG's knowledge, Marino submitted a job application to Swiss Re, a global insurance and finance company.  Marino applied to be Swiss Re's Head of Financial Products ("Fin Pro"), North America.  As part of her application to Swiss Re, Marino represented in writing that she was not subject to any restrictive covenants with a current or former employer, such as a non-compete agreement that might affect her ability to perform the duties of the job for which she was applying.  By the express terms of her application, Marino acknowledged that "falsification and/or omission of information may jeopardize [her] employment" and "Swiss Re may seek to verify the information on the application."  She also authorized all "previous employers . . . to disclose any and all information requested by Swiss Re."

14

12.     Three days later, on November 23, 2013, Marino received an initial offer letter from GSG for the position of Senior Vice President and Director of Professional Lines (the "Offer Letter") (attached hereto as Exhibit A).  The terms included a base salary of $300,000, which made Marino one of the highest paid and most senior employees of GSG and its affiliates.  In consideration for this substantial compensation, the Offer Letter required Marino to devote her full business time and her best efforts, business judgment, knowledge and skill, exclusively to the advancement of the business and interests of GSG and its affiliates, and to the performance of her duties and responsibilities on their behalf.  (Offer Letter at 4.)

13.     In addition to the Offer Letter, and as a condition of the offer itself, Marino received an agreement entitled "Confidentiality and Intellectual Property Agreement with Certain Other Restrictive Covenants" (attached hereto as Exhibit B).  The Restrictive Covenants Agreement contains, among other terms, a non-compete provision that prevents employees from providing services to a competitor of GSG or its affiliated insurance companies for twelve months after leaving GSG.

14.     Marino objected to certain terms in the Restrictive Covenants Agreement, and in particular, sought deletion of Section 29 entitled "Legal Fees."  As originally drafted, Section 29 would have required Marino, in certain circumstances, to pay the legal fees and expenses of GSG or other parties who took legal action to enforce the Restrictive Covenants Agreement against Marino.

15.     Excited at the prospect of bringing Marino on board to build a professional lines division, and without knowledge that Marino intended to breach her agreements with GSG, GSG acceded to Marino's demand to delete Section 29.  During the course of negotiations, Marino

represented that she had consulted an attorney to review the proposed terms of her Offer Letter and Restrictive Covenants Agreement.

16.     Marino initially wanted to start at GSG as soon as she and GSG finalized the conditions of her employment.  Without explanation, however, Marino then asked to push back her start date, originally scheduled for early December 2013, to January 2014.  GSG again granted Marino's request.

17.     Having not heard from Swiss Re about her application, on December 3, 2013, Marino signed a revised Offer Letter and Restrictive Covenants Agreement with GSG.  In the Offer Letter, Marino expressly agreed that as a condition of the offer and her employment — for which she would be paid $300,000 per year and be eligible for significant bonuses — she would comply with the terms of the Offer Letter and the Restrictive Covenants Agreement.

18.     Marino agreed in the Restrictive Covenants Agreement that during the twelve-month period following her last day of employment with GSG, she would not "directly or indirectly . . . provide employment, consulting, advisory or any other services, with or without compensation (whether in cash, equity or otherwise) to any Person engaged, or planning to engage in" a "Competitive Business," as that term is defined in the agreement, unless GSG provided an express written waiver.  (Restrictive Covenants Agreement ¶ 22.2.)

19.     The Restrictive Covenants Agreement also requires Marino to provide a copy of that agreement to potential future employers and requires Marino to notify GSG of new business activities that she plans to pursue so that GSG can determine in advance whether the new activities comply with the terms of the Restrictive Covenants Agreement or require a waiver. (*Id.*  ¶¶ 25.1 - 25.2.)

20.     Under the plain language of the Restrictive Covenants Agreement, GSG has the express right to notify prospective employers that Marino is subject to that agreement and to provide prospective employers with a copy of it.  (*Id.* ¶ 25.2.)

21.     Pursuant to Section 25.2 of the Restrictive Covenants Agreement, Marino agreed to hold harmless GSG, any GSG affiliates and GSG related persons for "any and all claims, including all connected costs, and any and all damages in any way Arising Out Of the Company or any of its Affiliates providing notice of the Employee's obligations under this Agreement and/or a copy of this Agreement to any Person."  (*Id.*)

22.     Despite Marino having executed the Offer Letter and Restrictive Covenants Agreement, on information and belief, she never intended to comply with many of the obligations set forth in those agreements.  She instead intended to obtain long-term employment with Swiss Re while using GSG only as a short-term means of securing compensation, establishing her salary level for her eventual offer from Swiss Re, and building her public profile at GSG's expense and detriment.  Marino's intentions are evidenced by the fact that Marino never updated her Swiss Re job application to reflect that she now worked for GSG and was subject to the Restrictive Covenants Agreement, including a non-compete obligation.

**GSG Expends Significant Resources to Help Marino Succeed, While Marino
Surreptitiously Pursues Employment with Swiss Re**

23.     Marino's first day of employment with GSG was January 6, 2014.  No more than eight days later, Marino communicated with Swiss Re recruiter, Melissa Pollack, about Marino's pending job application for the job of Head of Fin Pro North America for Swiss Re.  Pollack invited Marino to interview for the role and soon thereafter, Marino met with Robert Petrilli, CEO and Managing Director of Corporate Solutions at Swiss Re and the manager for the open position.

24.     Throughout late January and February 2014, rather than providing services to GSG, Marino spent significant time meeting with Petrilli and other high ranking Swiss Re executives to interview for the role, all the while receiving paychecks and diverting time and resources from GSG to launch a division that, in fact, she never intended to develop.

25.     At no point during these interviews did Marino inform Swiss Re about the terms of the Restrictive Covenants Agreement she had signed with GSG or provide Swiss Re with a copy of that agreement.  Such actions would have required Marino to "give prompt notice" to GSG of her intentions to join Swiss Re.  (Restrictive Covenants Agreement ¶ 25.2.)

26.     Unaware of Marino's covert discussions with Swiss Re, GSG undertook a series of highly visible steps to enhance Marino's profile within GSG and its affiliates and among their external business partners.  On January 10, after Marino's review, Mr. Linton issued a glowing announcement of Marino's hiring in a company-wide internal email.  The announcement stated that Marino would be located in a soon-to-be opened New York City office and would be responsible for "developing a sound, long term business strategy, building a first-class team and launching Professional Lines products for us."  Marino did not inform Mr. Linton before he issued the announcement that she was in fact pursuing another job opportunity.

27.     Only four days later, on January 14, Marino was communicating secretly with Ms. Pollack about the role at Swiss Re.

28.     On January 17, a widely distributed press release announced to the market and customers the engagement of Marino to build and direct the new business unit.  The press release, like the internal announcement, publicized the planned entry of GSG's insurance affiliates into the professional lines market and stated that Marino would be responsible for "developing and implementing a sound, long-term business strategy."  Marino did not inform

GSG prior to the distribution of the press release that she was in fact pursuing another job opportunity.

29.     The very day this press release issued, Marino had a second secret phone conversation with Pollack about obtaining a position at Swiss Re.

30.     GSG expended significant time and resources to secure office space in New York City to house a professional lines team.  In January and February 2014, Marino visited several of these potential new office spaces.

31.     During this time, instead of providing services to GSG, Marino spent hours interviewing with high-level Swiss Re executives.  Upon information and belief, Marino failed to inform any of the Swiss Re executives with whom she spoke that she was subject to the Restrictive Covenants Agreement.  After the interviews, Marino wrote to Swiss Re's Head of North America Property, Jamie Miller, that she "would love to be a part of the team."  Marino continued to keep secret from GSG and her colleagues at GSG and GSG's affiliates the fact that she was and had long been aggressively pursuing another job opportunity.

32.     While Marino continued her clandestine conversations with Swiss Re, GSG and its affiliates continued to build Marino's profile both within the company and in the professional lines marketplace, and expended significant energy and resources to help her succeed.  In late February, Mr. Linton confidentially provided Marino with the names of potential professional lines team members obtained through his own contacts.  These were individuals for Marino to contact to help grow the professional lines business.  Mr. Linton in writing also informed agents and brokers who interacted with GSG's insurance affiliates of a new organizational structure that showed Marino in charge of a new professional lines business.  Mr. Linton never would have provided these confidential names to Marino nor advised the market of this organizational

structure had GSG and its affiliates not wished to establish its professional lines division with Marino at the helm or had Mr. Linton known Marino was in the process of obtaining another job.

33.     In contrast to the energy and resources GSG and its affiliates expended to help Marino develop the professional lines business, Marino spent little time performing her actual job responsibilities.  She never even completed the business plan that was intended to serve as the basis for the professional lines division.  The revised proposal she submitted in late February 2014 contained substantially less detail than the one she had volunteered during the interview process and did not respond to the feedback she had received from GSG executives.  On information and belief, Marino did not spend time on the plan because she was planning to leave GSG just a few days later.

34.     On March 4, less than two months after joining GSG, Marino accepted a job offer from Swiss Re to become the Head of Fin Pro North America.  That same day, Marino advised GSG that she was resigning and gave GSG only three days' notice.  At no time did Marino provide GSG with any of the written notices required under the Restrictive Covenants Agreement or seek a potential waiver of her obligations.

35.     Shortly before Marino sent GSG her resignation letter, Eric Smith, President and CEO of Swiss Re Americas, called Mr. Linton for the first time to inform him that Swiss Re was in discussions with Marino about possible employment.  Mr. Linton, assuming that Marino had complied with her obligations and shared a copy of the Restrictive Covenants Agreement with Swiss Re, asked Smith whether Swiss Re had reviewed the agreement and intended to abide by its terms.  To Mr. Linton's surprise, Smith responded that he had no idea Marino was subject to the Restrictive Covenants Agreement, as she had never mentioned it nor provided Swiss Re with a copy.

36.     Smith and other Swiss Re executives previously had questioned Marino's integrity based on her willingness to leave GSG after only two months.  On March 7, in light of revelations that Marino hid her non-compete from Swiss Re, Swiss Re decided to revoke its offer of employment to Marino.

37.     To date, GSG has not found a suitable replacement to develop a professional lines division.  As a result, GSG has lost substantial business opportunities and incurred needless time and expenses associated with Marino's aborted efforts.

**Marino Files One Meritless Lawsuit Against GSG and Maliciously Colludes with a GSG Competitor to File a Second Lawsuit Against GSG and Its Affiliates**

38.     On May 16, 2014, Marino filed suit against GSG alleging, *inter alia*, that GSG tortiously interfered with Marino's business expectancy by notifying Swiss Re about Marino's obligations under the Restrictive Covenants Agreement.  Marino brought this suit despite explicitly agreeing in the Restrictive Covenants Agreement to share a copy of that agreement with potential employers and to permit GSG and its affiliates to communicate with Marino's potential employers about the terms of the agreement and provide them with a copy of it.

39.     The Restrictive Covenants Agreement also requires Marino to hold harmless GSG, any GSG affiliates, and any GSG related persons for "any and all claims, including all connected costs, and any and all damages in any way Arising Out Of the Company or any of its Affiliates providing notice of the Employee's obligations under this Agreement and/or a copy of this Agreement to any Person."  "Arising Out Of" is defined therein as "arising out of, in connection with or in any way related to."  GSG has already spent many thousands of dollars defending this lawsuit, and those costs are ongoing and mounting.  Under the terms of the Restrictive Covenants Agreement, GSG and its affiliates are entitled to recoup these expenses

from Marino as well as costs "arising out of, in connection with, or in any way related to" the lawsuit.  (Restrictive Covenants Agreement ¶ 25.2.)

40.     As a result of the fabricated allegations in Marino's lawsuit against GSG, and in violation of her agreements with GSG, Marino also successfully colluded with a competitor of GSG's and its affiliates' insurance business in the case captioned *Argo Group US, Inc. et al. v. Louis D. Levinson et al.,* Cause No. 2014-CI-09550, in the District Court, 224th Judicial District, Bexar County, Texas (the "Argo Litigation").  On June 16, 2014, plaintiffs in the Argo Litigation filed a petition and request for a temporary and permanent injunction alleging that GSG aided and abetted Louis D. Levinson, now President of GSG's affiliated insurance companies, in the breach of his fiduciary duties and tortiously interfered with his non-compete contract with Argo, Levinson's former employer.  These plaintiffs request injunctive and compensatory relief against GSG and its affiliates.  GSG has already spent significant sums defending itself in the Argo Litigation, and those sums are also ongoing and mounting.  Under the terms of the Restrictive Covenants Agreement, GSG and its affiliates are entitled to recoup these expenses and all other related costs from Marino.

41.     The Argo plaintiffs based their allegations against GSG and its affiliates almost entirely on (i) the gratuitous or false allegations contained in Marino's Complaint in this lawsuit, and, on information and belief, (ii) information provided by Marino's lead counsel, Christine Palmieri, to Steven Manchel, lead counsel for Argo Group.  Marino was aware that Levinson had been retained by a GSG affiliate to begin serving as the President of GSG's affiliated insurance companies following the expiration of his one-year non-compete agreement with Argo.

42.     In addition to repeating many of Marino's gratuitous and false allegations, the Argo plaintiffs attached Marino's Complaint as an exhibit to their petition and request for a

temporary and permanent injunction. The Marino Complaint contains gratuitous and false allegations about Marino's interactions with Mr. Levinson that are irrelevant to her claims against GSG, and, on information and belief, were included by Marino for the purpose of colluding with Argo to file suit against GSG and its affiliates. In fact, Argo's CEO Mark Watson, III admitted in sworn deposition testimony that Argo based its claims in large measure on Marino's allegations in her Complaint regarding her interactions and dealings with Mr. Levinson.

43.     Beginning in April 2014, prior to the filing of this lawsuit and the Argo Litigation, and continuing through at least January 2015, Palmieri and Manchel engaged in extensive email and telephone communications with each other, the contents of which they have tried to hide. In these communications, on information and belief, Palmieri and Manchel, acting on behalf of their clients, discussed the Marino and Argo lawsuits and sought to assist each other in their litigation efforts against GSG and its affiliates.

## FIRST CLAIM
(Negligent Misrepresentation)

44.     GSG repeats and realleges the allegations contained in paragraphs 1 through 43 as if separately set forth herein.

45.     Marino supplied false information to GSG during her recruitment and during her tenure at GSG concerning, among other things, her long-term commitment to building a professional lines division at GSG and her intention to stay at GSG to develop that line of business.

46.     Even before Marino joined GSG, she planned to take the position with Swiss Re, if offered.

47.     Marino knew her representations regarding her intention to build a professional lines division were false at the time she made them and failed to exercise reasonable care in communicating her intentions to GSG.

48.     Marino supplied the false information to induce GSG to extend her an offer of employment and to conceal her true intentions.

49.     GSG justifiably relied on Marino's representations in offering her employment, publicly building up her profile and expending resources to develop GSG's professional lines division.

50.     GSG has been harmed by Marino's deceptive and duplicitous conduct.  GSG made public announcements concerning the development of a new business unit that has been placed on hold for an unknown period of time, causing embarrassment to GSG among its competitors, agents, brokers, reinsurers and others.  To date, GSG has not found a suitable replacement to develop its professional lines division.  As a result, GSG and its affiliates have lost substantial business opportunities.  GSG also will incur significant costs to replace Marino.

51.     Marino's negligent misrepresentations have caused actual damages to GSG, for which GSG seeks recovery.

**SECOND CLAIM**
(Breach of Contract)

52.     GSG repeats and realleges the allegations contained in paragraphs 1 through 51 as if separately set forth herein.

53.     As set forth above, Marino is bound by the Restrictive Covenants Agreement and Offer Letter (collectively, the "Agreements") she signed as a condition of her employment with GSG.

54.     GSG has performed its contractual obligations under the Agreements.

55.     By virtue of, among other things, Marino's failure to devote her full business time and best efforts to the advancement of GSG's business interests and to notify Swiss Re of the terms of the Restrictive Covenants Agreement, Marino violated the terms of the Agreements.

56.     Marino's failure to comply with the Agreements has caused actual damages to GSG, for which GSG seeks recovery.

## THIRD CLAIM
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

57.     GSG repeats and realleges the allegations contained in paragraphs 1 through 56 as if separately set forth herein.

58.     As set forth above, Marino is bound by the Agreements she signed as a condition of her employment with GSG.

59.     By virtue of, among other things, her duplicitous failure to notify Swiss Re of the terms of the Restrictive Covenants Agreement, Marino impeded and interfered with GSG's right to receive such notice under the express terms of the Agreements, which GSG reasonably expected to receive.

60.     Marino breached her notification obligations under the Agreements knowingly and in bad faith in order to deceive and deprive GSG of its right to protect its business interests, as provided under the Agreements.

61.     Marino also failed to devote her full business time and best efforts to the advancement of GSG's business interests, in violation of the Offer Letter, through her covert efforts to obtain employment with Swiss Re.

62.     On information and belief, Marino entered into the Agreements while intending not to comply with many of the obligations set forth therein.

63.     Marino's breach of the implied covenant of good faith and fair dealing has caused actual damages to GSG, for which GSG seeks recovery.

## FOURTH CLAIM
### (Breach of the Fiduciary Duty)

64.     GSG repeats and realleges the allegations contained in paragraphs 1 through 63 as if separately set forth herein.

65.     Marino, as a senior executive of GSG, owed GSG a fiduciary duty of loyalty.

66.     Marino violated her fiduciary duty of loyalty by failing to devote her full business time and best efforts to the advancement of GSG's business interests, through her covert efforts to obtain employment with Swiss Re rather than developing the professional lines division for which GSG hired her.

67.     Marino, through her counsel, also violated her fiduciary duty of loyalty, by, among other things, colluding with and providing information to Argo's lead counsel, Mr. Manchel, and by making gratuitous and false allegations regarding Mr. Levinson in her Complaint, in order to facilitate the Argo Litigation, assist a competitor of GSG's, and to disrupt Mr. Levinson's employment by GSG's affiliates.

68.     Marino's breach of her fiduciary duty of loyalty has caused actual damages to GSG, for which GSG seeks recovery.

## FIFTH CLAIM
### (Contractual Indemnification for Marino's Suit Against GSG)

69.     GSG repeats and realleges the allegations contained in paragraphs 1 through 68 as if separately set forth herein.

70.     As set forth above, Marino is bound by the Agreements she signed as a condition of her employment with GSG.

71.     GSG has performed its contractual obligations under the Agreements.

72.     The Restrictive Covenants Agreement requires Marino to indemnify GSG for "any and all claims, including all connected costs, and any and all damages in any way Arising Out Of the Company or any of its Affiliates providing notice of the Employee's obligations under this Agreement and/or a copy of this Agreement to any Person."

73.     The present lawsuit Marino has brought against GSG, by its terms as alleged, arises out of GSG's conduct in providing notice of Marino's obligations under the Restrictive Covenants Agreement and a copy of that agreement to Swiss Re.

74.     GSG and its affiliates are entitled to indemnification for any liability or costs, including attorneys' fees and costs associated with increases in liability insurance premiums, they incur in connection with the lawsuit brought by Marino against GSG.

## SIXTH CLAIM
### (Contractual Indemnification for the Argo Litigation)

75.     GSG repeats and realleges the allegations contained in paragraphs 1 through 74 as if separately set forth herein.

76.     As set forth above, Marino is bound by the Agreements she signed as a condition of her employment with GSG.

77.     GSG has performed its contractual obligations under the Agreements.

78.     The Restrictive Covenants Agreement requires Marino to indemnify GSG for "any and all claims, including all connected costs, and any and all damages in any way Arising Out Of the Company or any of its Affiliates providing notice of the Employee's obligations under this Agreement and/or a copy of this Agreement to any Person."

79. The Argo Litigation arises out of GSG's conduct in providing notice of Marino's obligations under the Restrictive Covenants Agreement and a copy of that agreement to Swiss Re.

80. GSG and its affiliates are entitled to indemnification for any liability or costs, including attorneys' fees and costs associated with increases in liability insurance premiums, they incur in connection with the Argo Litigation.

## SEVENTH CLAIM
### (Breach of Contract)

81. GSG repeats and realleges the allegations contained in paragraphs 1 through 80 as if separately set forth herein.

82. As set forth above, Marino is bound by the Agreements she signed as a condition of her employment with GSG.

83. GSG performed its contractual obligations under the Agreements.

84. Marino, through her counsel, violated the terms of the Agreements by, among other things, colluding with and providing information to Argo's lead counsel, Mr. Manchel, and by making gratuitous and false allegations regarding Mr. Levinson in her Complaint, in order to facilitate the Argo Litigation against GSG and Mr. Levinson.

85. Marino's failure to comply with the Agreements has caused actual damages to GSG, for which GSG seeks recovery.

## EIGHTH CLAIM
### (Tortious Interference with Business Expectancy)

86. GSG repeats and realleges the allegations contained in paragraphs 1 through 85 as if separately set forth herein.

87.     Marino was aware that Levinson had been retained by an affiliate of GSG following the expiration of his one-year non-compete agreement with Argo.

88.     Marino, through her counsel, intentionally interfered with GSG and its affiliates' business expectancy with Mr. Levinson, by, among other things, colluding with and providing information to Argo's lead counsel, Mr. Manchel, and by making gratuitous and false allegations regarding Mr. Levinson in her Complaint, in order to facilitate the Argo Litigation.

89.     As a result of Marino's malicious interference, and in coordination with Argo through her counsel, Argo sued Mr. Levinson, GSG and its affiliates in an effort to disrupt Mr. Levinson's employment by GSG's affiliates, and GSG and its affiliates have been forced to incur, and continue to incur, significant expenses defending the Argo Litigation.

WHEREFORE, GSG demands judgment against Marino as follows:

A.  On its First Claim, damages resulting from Marino's negligent misrepresentation, in amounts to be determined, plus interest;

B.  On its Second Claim, damages resulting from Marino's breach of contract, in amounts to be determined, plus interest;

C.  On its Third Claim, damages resulting from Marino's breach of the implied covenant of good faith and fair dealing, in amounts to be determined, plus interest;

D.  On its Fourth Claim, damages resulting from Marino's breach of her fiduciary duties, in amounts to be determined, plus interest;

E.  On its Fifth Claim, damages resulting from Marino's duty to hold GSG harmless, in amounts to be determined, plus interest;

F.  On its Sixth Claim, damages resulting from Marino's duty to hold GSG harmless, in amounts to be determined, plus interest;

G.  On its Seventh Claim, damages resulting from Marino's breach of contract, in amounts to be determined, plus interest;

H.  On its Eighth Claim, damages resulting from Marino's tortious interference, in amounts to be determined, plus interest; and

I.  Such other relief as the Court deems just and proper.

## JURY DEMAND

GSG demands a trial by jury on all claims triable to a jury.

Respectfully submitted,

/s/ Anthony Herman

| | |
|---|---|
| Patricia E. Reilly (CT08352) | Anthony Herman  (ct13749) |
| LITTLER MENDELSON P.C. | Joshua Asher (phv07216) |
| One Century Tower | COVINGTON & BURLING LLP |
| 265 Church Street, Suite 300 | One City Center |
| New Haven, CT 06510 | 850 Tenth Street, NW |
| Phone:  (203) 974-8700 | Washington, DC 20001 |
| Fax:  (203) 974-8799 | Phone:  (202) 662-6000 |
| preilly@littler.com | Fax:  (202) 662-6291 |
| | aherman@cov.com; jasher@cov.com |

*Attorneys for Guilford Specialty Group, Inc.*

DATED:  April 24, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of April, 2015, a copy of the foregoing and all supporting materials was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system.  Parties may access this filing through the Court's electronic filing system.

*/s/ Anthony Herman*
Anthony Herman (ct13749)