UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **LORI MARINO,** | : |
| | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | : Civil Action No. 3:14-cv-00705-AVC |
| | : |
| | : |
| **GUILFORD SPECIALITY GROUP, INC.,** | : May 29, 2015 |
| | : |
| | : |
| **Defendant.** | : |

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION TO
DISMISS IN PART DEFENDANT'S COUNTERCLAIMS**</u>

LIDDLE & ROBINSON, L.L.P.

Christine A. Palmieri (phv06821)
800 Third Avenue
New York, New York 10022
Tel.: 212-687-8500
Fax: 212-687-1505
cpalmieri@liddlerobinson.com

MURTHA CULLINA LLP

Kristen L. Zaehringer (ct27044)
177 Broad Street
Stamford, Connecticut 06901
Tel.: 203-653-5406
Fax: 860-240-5758
kzaehringer@murthalaw.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page No.**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................... 1

FACTUAL SUMMARY ................................................................................................................. 2

      Marino Accepts Employment With GSG ........................................................................ 2

      Marino Is Offered a Position at Swiss Re ........................................................................ 4

      Linton's Tortious Interference Causes Swiss Re to Revoke Its Job Offer ..................................................................................................................... 5

ARGUMENT ................................................................................................................................... 7

   I.   Standard of Review ............................................................................................ 7

   II.  GSG's Counterclaims Based Upon Marino's Participation in the Judicial Process Must be Dismissed Because They Are Barred as a Matter of Law ..................................................................................................... 7

   III. GSG's Counterclaim for Indemnification for This Litigation Is Not Plausible Because It Rests On a False Premise ............................................... 12

CONCLUSION ............................................................................................................................. 15

# **TABLE OF AUTHORITIES**

**Page No.**

**Cases**

Alexandru v. Dowd, 79 Conn. App. 434, 830 A.2d 352 (2003), cert. denied,
  266 Conn. 925, 835 A.2d 471 (2003) .................................................................................. 10

Ashcroft v. Iqbal, 556 U.S. 662 (2009) .............................................................................. 7, 12

Barnett v. Carberry, Civ. No. 3:08-714, 2009 WL 902396 (D. Conn. Mar. 30, 2009) .................. 7

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ....................................................................... 7

Briscoe v. LaHue, 460 U.S. 325 (1983) ...................................................................................... 9

Carney v. Amendola, No. CV106003738, 2014 WL 2853836 (Conn. Super. May 15, 2014) ....... 9

Carvel Corp. v. Noonan, 3 N.Y.3d 182, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004) ................. 14

Craig v. Stafford Construction, Inc., 271 Conn. 78, 856 A.2d 372 (2004) ................................... 9

Devone v. Finley, No. 3:13-CV-00377 CSH, 2014 WL 1153773 (D. Conn. Mar. 20, 2014) ...... 12

Febbroriello v. Babij, No. CV126006481S, 2015 WL 1919770 (Conn. Super. Mar. 31, 2015) .... 9

Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980) ....................................................................... 7

Kelley v. Bonney, 221 Conn. 549, 606 A.2d 693 (1992) ............................................. 1, 8, 10, 11

Kelly v. Golden, 352 F.3d 344 (8th Cir. 2004) ........................................................................... 10

Kimmel & Silverman, P.C. v. Porro, No. 11-11124-GAO, 2014 WL 524261310
  (D. Mass. Sept. 30, 2014) ..................................................................................................... 10

McManus v. Sweeney, 78 Conn. App. 327, 827 A.3d 708 (2003) .............................................. 10

Morneau v. State, 150 Conn. App. 237, 90 A.3d 1003 (2014) ................................................... 10

Pungitore v. Barbera, 506 Fed. Appx. 40 (2d Cir. 2012) ........................................................... 12

Rain v. Rolls–Royce Corp., 626 F.3d 372 (7th Cir. 2010) .......................................................... 10

Rhea v. Uhry, 354 Fed. Appx. 469 (2d Cir. 2009) .................................................................. 9, 10

Rioux v. Barry, 283 Conn. 338, 927 A.2d 304 (2007) ............................................................ 9, 10

Samuels v. Air Transp. Local 504, 992 F.2d 12 (2d Cir. 1993) ....................................................... 7

Schreiber v. Fed. Ins. Co., No. CV000091899, 28 Conn. L. Rptr. 693, 2001 WL 84028
    (Conn. Super Jan. 9, 2001)...................................................................................................... 10

Simms v. Seaman, 308 Conn. 523, 69 A.3d 880 (2012)................................................................ 10

Stone v. Pattis, 144 Conn. App.79, 72 A.3d 1138 (2013) ......................................................... 9, 10

Tucker v. Bitonti, 34 Conn. Supp. 643, 382 A.2d 841 (Conn. Super. 1977)................................. 10

Walsh v. Law Offices of Howard Lee Schiff, No. 3:11−cv−1111 (SRU),
    2012 WL 4372251 (D. Conn. Sept. 24, 2012) ......................................................................... 10

Plaintiff, Lori Marino ("Plaintiff" or "Marino"), submits this memorandum of law in support of her motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the following Counterclaims filed by Defendant, Guilford Specialty Group, Inc. ("Defendant" or "GSG"): breach of fiduciary duty (Fourth Counterclaim) (to the extent it is based on the Argo Litigation); contractual indemnification for Marino's suit against GSG (Fifth Counterclaim); contractual indemnification for the Argo litigation (Sixth Counterclaim); breach of contract (Seventh Counterclaim); and tortious interference with business expectancy (Eighth Counterclaim) (Dkt. # 48).

## PRELIMINARY STATEMENT

The purported claims set forth in GSG's Fourth, Fifth Sixth, Seventh and Eighth Counterclaims are barred as a matter of law pursuant to Connecticut's absolute privilege for participation in judicial process because they are based on statements made in judicial proceedings (i.e., allegations made by Marino in the Complaint, which she filed with this Court when she commenced the instant litigation; allegations made by a third party, Argo, in a Complaint that it filed in another court; and testimony that Argo's CEO gave in a deposition as part of the Argo litigation, see Counterclaim ¶¶ 40-42), and on communications between the plaintiffs' attorneys for the purpose of marshalling evidence to be used in support of judicial proceedings (i.e., this action and the Argo Litigation, see Counterclaim ¶¶ 41, 43). Notably, Connecticut's absolute privilege extends "even to communications that are preliminary to a proposed judicial proceeding … if they bear some relation to that proceeding." Kelley v. Bonney, 221 Conn. 549, 571-73, 606 A.2d 693 (1993). Thus, dismissal of these counterclaims is warranted because they are barred by this absolute privilege, which has long been recognized by the Connecticut courts.

1

Dismissal of GSG's Fifth Counterclaim is also appropriate because it is not plausible, since it rests upon an unsupported, conclusory and false premise. Notwithstanding the fact that the Restrictive Covenants Agreement upon which GSG relies in its Fifth Counterclaim does not include an attorneys' fee provision, GSG has endeavored to assert a claim for attorneys' fees against Marino by purporting to allege contractual indemnification, which summarily concludes, without any supporting factual allegations, that Marino's lawsuit against GSG for tortious conduct "arises out of GSG's conduct in providing notice of Marino's obligations under the Restrictive Covenants Agreement and a copy of that agreement to Swiss Re."  Id. at ¶ 73. This unsupported, conclusory allegation is patently incorrect, as evidenced by the Complaint in this action. Marino's Complaint (Dkt. # 1) simply does not "Aris[e] Out Of the Company or any of its Affiliates providing notice of the Employee's obligations under [the Restrictive Covenants] Agreement and/or a copy of this Agreement to any Person," since, as recognized by this Court in its ruling denying GSG's Motion to Dismiss (Dkt. # 45), it is premised on GSG's tortious conduct, including tortious interference and negligent misrepresentation.

## FACTUAL SUMMARY

**Marino Accepts Employment With GSG**

Marino is an accomplished insurance company senior executive with nearly twenty years of specialty lines experience. Compl. at ¶ 7. In late September 2013, Marino was asked by a reinsurance broker whether she could give Marino's name to Louis Levinson ("Levinson"), GSG's incoming President, to discuss a potential job opportunity. Id. at ¶ 8. Shortly thereafter, Levinson called Marino. He described for her his vision for GSG and indicated that he wanted to start a Professional Lines Division. Levinson then asked Marino to contact Robert Linton ("Linton"), GSG's Chairman, to arrange an interview. Id. at ¶ 9.

On or about October 2, 2013, Marino met with Linton. They discussed Marino's proposed role in detail, as well as the platform and resources GSG had to offer. At the conclusion of the meeting, Linton advised Marino that she would need to prepare a business plan if she was to be formally offered the role. Id. at ¶ 10.

Marino prepared a business plan detailing her analysis of GSG's opportunity in the Professional Liability marketplace. The plan included information Linton provided to Marino in their October 2 meeting regarding, among other things, GSG's resources and risk appetite. Id. at ¶ 11. On or about October 18, Marino submitted the plan to Linton. Levinson had already approved the plan and, several days later, he told Marino that Linton had also approved the plan and that they would move forward with her candidacy. Id. at ¶ 13.

On November 23, 2013 Marino received an offer for the position of GSG's Senior Vice President and Director of Professional Lines and an agreement entitled, "Confidentiality and Intellectual Property Agreement with Certain Other Restrictive Covenants" (the "Restrictive Covenants Agreement"). Id. at ¶ 16. On December 3, 2013, following a discussion with Linton, Marino signed the offer letter and Restrictive Covenants Agreement. Id. at ¶ 19.

From mid to late January, Marino continued to ask for feedback on a detailed 90-day action plan she had submitted, which outlined how she intended to launch her product and enter GSG into the Professional Lines marketplace. Finally, on or about January 31, 2014, Betsy Monrad ("Monrad"), GSG's Chief Operating Officer, told Marino that Linton wanted her to develop another version of the business plan that would limit the insurance capacity offered on her products and restrict the types of coverage offered. Marino was told, contrary to her plan, that she would need to dramatically increase her reinsurance limits to a level outside industry norms. Marino responded that such limitations would basically render GSG uncompetitive and

3

not viable in the Professional Lines marketplace. Monrad then said that GSG never had, and would not for the foreseeable future have, an appetite for the kind of capacity and net retentions proposed in Marino's original business plan. Id. at ¶ 26.

On or about February 28, 2014, Marino provided a revised business plan to Linton that incorporated all of his demands for changes and documented some of the new hurdles that significantly impacted the plan. Linton reacted to the revised plan by presenting more questions and hurdles not previously discussed and that, in some cases, made the success of the plan dependent upon factors completely outside of Marino's control. Id. at ¶ 33.

**Marino Is Offered a Position at Swiss Re**

In November 2013, Marino applied for the position of Head of Fin Pro (Financial and Professional) North America for Swiss Re. Not having heard back from Swiss Re, Marino accepted the position at GSG on December 3, 2013. Id. at ¶ 35. Then, on or about January 14, 2014, Swiss Re recruiter Melissa Pollack ("Pollack") contacted Marino to follow up on her application. Marino advised Pollack that she had just started in her new role at GSG, which was a client of Swiss Re's reinsurance division, and had signed an employment agreement and Restrictive Covenants Agreement. Pollack never asked Marino to execute an updated application for Swiss Re or to provide a copy of her GSG documents. Id. at ¶ 36.

In late January 2014, Marino met with Robert Petrilli ("Petrilli"), CEO and Managing Director of Corporate Solutions at Swiss Re and the manager for the open position. Marino and Petrilli agreed that there was no active conflict or concern with moving forward because GSG and Swiss Re did not compete in the Professional Lines space. Petrilli assured Marino that the fact that GSG was a small regional client of Swiss Re's reinsurance division would be vetted internally through Swiss Re and should not be an issue. Marino explained to

Petrilli that if Swiss Re wanted to make her an offer, it should happen sooner rather than later given that she had joined GSG so recently.  Id. at ¶ 38.

In February 2014, Marino proceeded through a rigorous interview process with multiple Swiss Re executives and board members.  None of the people Marino met with asked for copies of any of her agreements with GSG.  Id. at ¶ 39.  Then, on March 3, Petrilli conveyed to Marino an oral offer of employment.  Petrilli and Marino also discussed the Restrictive Covenants Agreement, with Petrilli again telling Marino that it would not be an issue, since Swiss Re and GSG did not compete for the same clients or in the same channels, and Marino had not yet conducted any business or hired any employees for GSG.  Id. at ¶ 40.

On the morning of March 4, Marino verbally accepted the Swiss Re offer.  That afternoon, she signed a written offer letter and then went to meet with Levinson.  Id. at ¶ 41.  At that meeting, Levinson informed Marino that Eric Smith, President and CEO of Swiss Re Americas, had called Linton that morning to inform him of the Swiss Re offer and Marino's verbal acceptance.  Levinson told Marino that he was disappointed she was leaving but thanked her for choosing to leave at such an early stage and prior to implementation of the business plan. Levinson advised Marino against speaking with Linton, however, since Linton was "ballistic" about the news of her departure.  Id. at ¶¶ 42-43.

**Linton's Tortious Interference Causes Swiss Re to Revoke Its Job Offer**

On the morning of March 5, Marino called Linton to personally convey her reasons for leaving GSG.  Marino explained that the Swiss Re role represented a rare and unique position in the Professional Lines marketplace that offered a large, global platform with one of the largest balance sheets in the industry, something GSG could not offer.  Linton told Marino he

5

was appreciative of the call but remained argumentative and threatened to take issue with Swiss Re. Id. at ¶ 45.

Upon information and belief, Linton made multiple calls to senior executives at various entities within Swiss Re for the purpose of intimidating the firm into revoking Marino's offer of employment. Among other things, Linton said that Marino had signed an "iron-clad" non-compete agreement, which he fully intended to enforce. Linton also lied and told Swiss Re that GSG had entered into a long-term lease in New York for Marino's team and had otherwise invested heavily in her, including paying substantial headhunter fees in connection with her hire. Id. at ¶ 47. On or about March 5, Petrilli advised Marino that Linton "has reached the General Counsel of Swiss Re Group in Zurich" and that the "beehive has been kicked." Petrilli also told Marino that Linton threatened to wage a public relations campaign against Swiss Re for stealing employees of clients. Petrilli then for the first time asked Marino for a copy of the Restrictive Covenants Agreement. Id. at ¶ 48.

On or about March 6, Petrilli advised Marino that her hiring had "taken on a life of its own" and that she must meet with representatives from Swiss Re Human Resources and Legal so that they could prepare a report for the Human Resources group in Zurich. Id. at ¶ 49. That same day, Marino spoke with representatives of Swiss Re's Human Resources and Legal departments and described the entire series of events. The next day, March 7, 2014, Swiss Re revoked its offer of employment to Marino. Petrilli told Marino, in the presence of Swiss Re Human Resources, that the reason the offer was being revoked was "Bob Linton and the non-compete." Id. at ¶¶ 51-52.

**ARGUMENT**

I. **Standard of Review**

A motion to dismiss pursuant to Rule 12(b)(6) challenges "the legal feasibility of the complaint," Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980), and must be granted "if a plaintiff fails to establish a claim upon which relief may be granted," Barnett v. Carberry, Civ. No. 3:08-714, 2009 WL 902396, at *4 (D. Conn. Mar. 30, 2009) (Covello, J.).[1] To survive a 12(b)(6) motion, a complaint must include "sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant" is liable. Iqbal, 556 U.S. at 678. While the Court "must accept as true all of the allegations contained in a complaint," the Court is not required to accept the truth of legal conclusions in the complaint and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. In its review of a 12(b)(6) motion to dismiss, the court may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken. Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993).

II. **GSG's Counterclaims Based Upon Marino's Participation in the Judicial Process Must be Dismissed Because They Are Barred as a Matter of Law**

The Fourth, Sixth, Seventh and Eighth Counterclaims each fail to state a claim upon which relief can be granted because Connecticut law has long recognized an absolute privilege for statements made in judicial proceedings, which extends to communications that are

---

[1] Copies of all unreported decisions are arranged in alphabetical order and attached hereto at Tab A.

7

preliminary to judicial proceedings as well as to statements made for the purpose of marshaling evidence. Kelley, 221 Conn. at 571-73.

For example GSG's counterclaims are largely based upon the notion that Marino's filing of her Complaint in the instant case was improper and facilitated an independent lawsuit filed by third-parties. GSG bases three of its Counterclaims on the conclusory assertion that unidentified facts "regarding Mr. Levinson" alleged by Marino in her Complaint were, in GSG's view, "gratuitous and false." See Counterclaim at ¶¶ 41-42; Fourth Claim (Breach of Fiduciary Duty) at ¶ 67; Seventh Claim (Breach of Contract) at ¶ 84; Eighth Claim (Tortious Interference with Business Expectancy) at 88. Similarly, GSG bases four of its Counterclaims on the assertion that Marino, *by filing her Complaint with this Court*, and Marino's attorney, by supposedly sharing unidentified "information," *facilitated an independent lawsuit by third-parties*, "the Argo plaintiffs," against GSG, its affiliates and Levinson, in which the Argo plaintiffs alleged, among other things, that GSG tortiously interfered with Levinson's non-compete agreement with Argo. Id. at ¶¶ 40-43; Fourth Claim (Breach of Fiduciary Duty) at ¶ 67; Sixth Claim (Contractual Indemnification for the Argo Litigation) at ¶ 69; Seventh Claim (Breach of Contract) at ¶ 84; Eighth Claim (Tortious Interference with Business Expectancy) at ¶¶ 88-89. In support, GSG alleges that Argo's CEO admitted in deposition testimony that Argo's lawsuit was based "in large measure on Marino's allegations in her Complaint[.]" Id. at ¶ 42. Moreover, GSG alleges that, "on information and belief," counsel for Marino and counsel for Argo, "acting on behalf of their clients, discussed the Marino and Argo lawsuits and sought to assist each other in their litigation efforts against GSG and its affiliates." Id. at ¶ 43. As a matter of law, the participation of Marino (as well as that of Marino's attorney, the Argo plaintiffs and their attorneys) in statements and communications in furtherance of the instant

8

action pending before this Court and the "Argo Litigation" is absolutely privileged. Consequently, GSG's claims based on such participation are barred and must be dismissed. See Rioux v. Barry, 283 Conn. 338, 342, 927 A.2d 304 (2007); Stone v. Pattis, 144 Conn. App.79, 99, 72 A.3d 1138 (2013).

"Under Connecticut law, it has long been established that there is an absolute privilege for statements made in judicial proceedings." Rhea v. Uhry, 354 Fed. Appx. 469, 470 (2d Cir. 2009) (internal citations and quotation marks omitted). "The effect of an absolute privilege is that damages cannot be recovered for the publication of the privileged statement even if the statement is false and malicious." Febbroriello v. Babij, No. CV126006481S, 2015 WL 1919770 at *8 (Conn. Super. Mar. 31, 2015) (citing Craig v. Stafford Construction, Inc., 271 Conn. 78, 84, 856 A.2d 372 (2004)); Carney v. Amendola, No. CV106003738, 2014 WL 2853836 at *5-7 (Conn. Super. May 15, 2014). "The policy underlying the privilege is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements." Rhea, 354 Fed. Appx. at 470-71 (internal quotation marks and citations omitted).[2] "Put simply, absolute immunity furthers the public policy of encouraging participation and candor in judicial and quasi-judicial proceedings. This objective would be thwarted if those persons whom the common-law doctrine was intended to protect nevertheless faced the threat of suit[.] As a result, courts have recognized absolute immunity as a defense in certain retaliatory civil actions in order

---

[2] The U.S. Supreme Court also has recognized that common law provides "absolute immunity from subsequent damages liability for all persons – governmental or otherwise – who were integral parts of the judicial process" because of the need to ensure "that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation." Briscoe v. LaHue, 460 U.S. 325, 335 (1983) (internal quotation marks and citations omitted).

9

to remove this disincentive and thus encourage citizens to come forward with complaints or to testify." Rioux, 283 Conn. at 343-44 (internal quotation marks and citations omitted).[3]

The absolute privilege "extends to every step of the proceeding until final disposition." Rhea, 354 Fed. Appx. at 471 (citations omitted). The Connecticut courts have viewed the requirement that the statements must be made in the course of a "judicial proceeding" very broadly. "It is not absolutely essential, in order to obtain the benefits of absolute privilege, that the [communication] be spoken in open court or contained in a pleading, brief or affidavit." McManus v. Sweeney, 78 Conn. App. 327, 335, 827 A.3d 708 (2003) (internal quotation marks omitted). "Even communications that are preliminary to a proposed judicial proceeding are absolutely privileged if they bear some relation to the proceeding." Stone, 144 Conn. App. at 97 (citing 3 Restatement (Second), Torts § 588, p. 250 (1977)); see also Kelley, 221 Conn. at 571-73.

For instance, in Kelley, a schoolteacher sued several people for statements made in support of a petition to have him decertified. 221 Conn. at 555–56. The petition was submitted to the state board of education pursuant a state statute, which outlines the

---

[3] The absolute litigation privilege originally developed as a defense to retaliatory defamation actions. See generally Simms v. Seaman, 308 Conn. 523, 531-39, 69 A.3d 880 (2012). The doctrine, however, has been extended and applied to a variety of other causes of action, including tort, contract and statutory claims. See, e.g., id., at 568–69 (common law fraud and intentional infliction of emotional distress); Rioux, 283 Conn. at 342 (intentional interference with contractual or beneficial relations); Morneau v. State, 150 Conn. App. 237, 265-66, 90 A.3d 1003 (2014) (violations of 42 U.S.C. § 1983); Stone, 144 Conn. App. at 99 (negligent infliction of emotional distress); Alexandru v. Dowd, 79 Conn. App. 434, 441, 830 A.2d 352 (2003) (libel, slander, intentional infliction of emotional distress and invasion of privacy), cert. denied, 266 Conn. 925, 835 A.2d 471 (2003); Walsh v. Law Offices of Howard Lee Schiff, No. 3:11–cv–1111 (SRU), 2012 WL 4372251 (D. Conn. Sept. 24, 2012) (cited with approval in Simms, 308 Conn. at 561) (CUTPA claims); Schreiber v. Fed. Ins. Co., No. CV000091899, 28 Conn. L. Rptr. 693, 2001 WL 84028 at *3-4 (Conn. Super Jan. 9, 2001) (contract claims based on pre-litigation comments to plaintiff's attorney and statements made in court documents); Tucker v. Bitonti, 34 Conn. Supp. 643, 647, 382 A.2d 841 (Conn. Super. 1977) (invasion of privacy); see also Rain v. Rolls–Royce Corp., 626 F.3d 372, 377-78 (7th Cir. 2010) (breach of contract); Kelly v. Golden, 352 F.3d 344, 350 (8th Cir. 2004) (breach of a confidentiality agreement); Kimmel & Silverman, P.C. v. Porro, No. 11-11124-GAO, 2014 WL 5242613 at *16 (D. Mass. Sept. 30, 2014) (breach of contract and tortious interference). Indeed, with the exception of the related claims for abuse of process, malicious prosecution and vexatious litigation, which are not at issue in GSG's Counterclaims, there do not appear to be any Connecticut opinions rejecting the applicability of the litigation privilege to claims based on statements made in connection with judicial proceedings.

decertification procedure. Id. at 567 n. 13.  The Connecticut Supreme Court, after concluding that "a decertification proceeding before the state board of education is quasijudicial in nature," id. at 571, posed the first issue in the case as "whether [the defendant]'s submission of the verified petition and complaint was a step in that proceeding."  Id.  The court answered the question by noting that the defendant's petition "was necessary under the circumstances to initiate the decertification process," subsequently concluding that "any statements made by [the defendant] in his verified petition and complaint filed pursuant to [the state statute] were absolutely privileged." Id.

The Kelley court also considered whether the absolute privilege extended to a parent, who had submitted a letter to the board of education that was included with the petition and a complaint forwarded to the state board of education – both of which the Court held were clearly covered by the absolute privilege.  Id. at 572.  Additionally, however, the parent had telephoned other parents to encourage them to submit complaint letters as well, and during these conversations she had communicated the allegedly defamatory statements.  As to statements made during these telephone conversations, the court concluded that since the statements were made to potential witnesses "for the purpose of marshaling evidence against the plaintiff to be used to support the complaint that was to be submitted to the state board of education," they were absolutely privileged.  Id. at 573.

Likewise here, GSG's allegations make it clear that its Fourth, Sixth, Seventh and Eighth Counterclaims are based on statements made in judicial proceedings (i.e., Marino's Complaint, Argo's Complaint and Argo's CEO's deposition testimony, see Counterclaim ¶¶ 40-42) and on communications between attorneys allegedly made for the purpose of marshalling evidence to be used in support of judicial proceedings (i.e., this action and the Argo Litigation,

see Counterclaim ¶¶ 41, 43). Specifically, GSG complains that Marino's allegations in her Complaint "facilitate[d] the Argo Litigation" and that Marino and Argo, through their counsel, "sought to assist each other in their litigation efforts against GSG and its affiliates." See Counterclaims at ¶¶ 40-43; Fourth Claim (Breach of Fiduciary Duty) at ¶ 67; Sixth Claim (Contractual Indemnification for the Argo Litigation) at ¶ 69; Seventh Claim (Breach of Contract) at ¶ 84; Eighth Claim (Tortious Interference with Business Expectancy) at ¶¶ 88-89. As in Kelley, all such statements and communications were made in the course of judicial proceedings and are absolutely privileged and, therefore, cannot form the basis of claims against Marino.[4] As such, GSG's Fourth (to the extent it is based on the Argo Litigation), Sixth, Seventh and Eighth Counterclaims fail to state a claim upon which relief can be granted and should be dismissed.

### III. GSG's Counterclaim for Indemnification for This Litigation Is Not Plausible Because It Rests On a False Premise

Notwithstanding the fact that the Restrictive Covenants Agreement upon which GSG relies in its Fifth Counterclaim does not include an attorneys' fee provision, GSG has endeavored to assert a claim for attorneys' fees against Marino by purporting to allege contractual indemnification. GSG's purported contractual indemnification claims fails to state a claim upon which relief can be granted because it is not plausible.

---

[4] GSG asserts, without any explanation or factual support, that some unidentified allegations about Levinson in Marino's Complaint were "gratuitous." GSG's conclusory use of the word "gratuitous" is insufficient as a matter of law to call into question whether any allegations in Marino's Complaint were related to issues in a judicial proceeding. On a motion to dismiss, a court should "ignore 'mere conclusory statements' or legal conclusions, which are not entitled to the presumption of truth." Pungitore v. Barbera, 506 Fed. Appx. 40, 42 (2d Cir. 2012) (citing Ashcroft, 556 U.S. at 678). Nevertheless, "[t]he test for relevancy is generous" – communications and statements "are absolutely privileged [so] long as they are in some way pertinent to the subject of the controversy[.]" Devone v. Finley, No. 3:13-CV-00377 CSH, 2014 WL 1153773, at *10 (D. Conn. Mar. 20, 2014) (Haight, J.) (citations omitted). A review of Marino's Complaint demonstrates that every allegation regarding Levinson relates to Marino's recruitment by and employment with GSG. See Compl. at ¶¶ 8-9, 12-13, 20, 24-25, 28-31, 34, 41-43, 45, 50. Such allegations, undeniably, "are in some way pertinent to," *inter alia*, Marino's claim that "Defendants supplied false information to Marino during her recruitment concerning, among other things, the scope of the business she would lead and the firm resources available to her." Id. at ¶ 59.

12

The Restrictive Covenants Agreement executed by Marino requires her to hold GSG harmless for "any and all claims, including all connected costs, and any and all damages in any way Arising Out Of the Company or any of its Affiliates providing notice of the Employee's obligations under this Agreement and/or a copy of this Agreement to any Person."[5]  See Counterclaim, Ex. B.  GSG asserts in its Fifth Counterclaim (Contractual Indemnification for Marino's Suit Against GSG) that Marino's lawsuit "arises out of GSG's conduct in providing notice of Marino's obligations under the Restrictive Covenants Agreement and a copy of that agreement to Swiss Re."  Id. at ¶ 73.  This unsupported, conclusory allegation is patently incorrect, as evidenced by the Complaint in this action.

Marino alleges for her First Claim (Tortious Interference With Business Expectancy) that GSG "intentionally interfered with Marino's business expectancy with Swiss Re by, among other things, misrepresenting the financial investment [it] had made in Marino's hire, threatening to sue to enforce Marino's non-compete and threatening to wage a public relations campaign against Swiss Re for hiring an employee away from one of its clients."[6]  Compl. at ¶ 56.  This claim is not – nor could it be – based on the mere act of informing Swiss Re of the existence of the Restrictive Covenants Agreement and providing a copy.  Instead, Plaintiff must allege – as she has – that GSG acted with improper means.

In successfully opposing GSG's motion to dismiss, Marino described GSG's improper means as follows:

---

[5] The phrase "Arising Out Of" is defined as "arising out of, in connection with or in any way related to." Counterclaims, Ex. B.

[6] Marino's Second, Third and Fourth Claims for negligent misrepresentation, promissory estoppel and for a declaratory judgment have nothing to do with GSG's communications to Swiss Re and thus cannot form the basis for indemnification.

13

> Linton did not simply advise Swiss Re of the existence of the Non-Compete and express his intent to enforce it. Instead, he lied by stating that [GSG] had paid substantial headhunter fees to hire Marino (it had paid none) and that it had entered into a long-term lease for office space in New York City to house her and her team (no space had been leased and it was intended for many others as well).[] These fabrications, which Defendants unconvincingly attempt to characterize as "bluster" and "posturing" …, are sufficient to establish improper means at the motion to dismiss stage.
>
> In addition, there is nothing reasonable about [GSG]'s threatening to "wage a public relations campaign" against Swiss Re, nor does such threat remotely equate to "publicly not[ing]" that Swiss Re had hired an employee away from a client."[7] (Id. at 27) There is a distinct difference between economic "pressure" and "persuasion," the former constituting wrongful means. See, e.g., Carvel Corp. v. Noonan, 3 N.Y.3d 182, 192, 785 N.Y.S.2d 359, 363-64, 818 N.E.2d 1100, 1104-05 (2004) (example of non-tortious economic persuasion). One can only imagine what else was said, and viewing all facts in the light most favorable to Marino, she has more than met her burden at the pleading stage and is entitled to fully explore the communications between [GSG] and Swiss Re in discovery.

Opp. to Motion to Dismiss (Dkt. # 22), at 19-20.

Therefore, because Marino's litigation simply does not "Aris[e] Out Of the Company or any of its Affiliates providing notice of the Employee's obligations under [the Restrictive Covenants] Agreement and/or a copy of this Agreement to any Person," and instead is entirely premised on GSG's tortious conduct, GSG's Fifth Counterclaim must be dismissed.

---

[7] As this Court noted in denying GSG's motion to dismiss, "[t]his alleged threat did not relate to the non-competition agreement, but instead rests solely upon Swiss Re's decision to hire Marino." Decision on Def.'s Motion to Dismiss (Dkt. # 45), at 13.

14

## **CONCLUSION**

For the foregoing reasons, Marino respectfully requests that the Fifth, Sixth, Seventh and Eighth Counterclaims asserted against her by GSG be dismissed in their entirety and that the Fourth Counterclaim be dismissed to the extent it is based on the Argo Litigation.

Dated: May 29, 2015

                                                LIDDLE & ROBINSON, L.L.P.

                                                By:  /s Christine A. Palmieri
                                                      Christine A. Palmieri (phv06821)
                                                800 Third Avenue
                                                New York, New York 10022
                                                Tel.:  212-687-8500
                                                Fax:  212-687-1505
                                                cpalmieri@liddlerobinson.com

                                                MURTHA CULLINA LLP

                                                By:  /s Kristen L. Zaehringer
                                                      Kristen L. Zaehringer (ct27044)
                                                177 Broad Street
                                                Stamford, Connecticut 06901
                                                Tel.:  203-653-5406
                                                Fax:  860-240-5758
                                                kzaehringer@murthalaw.com

                                                *Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on May 29, 2015, a copy of Plaintiff's Memorandum of Law In Support of Her Motion to Dismiss In Part Defendant's Counterclaims was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Christine A. Palmieri
Christine A. Palmieri